SHERMAN A. GENUNG, Respondent, *v.* ROSS M. TURNER, Appellant.

*Principal and agent — facts showing that third person was acting as agent for defendant — sales — action to recover for breach of contract for sale of corporate stock and bonds — measure of damages.*

Appeal from a judgment of the Supreme Court in favor of the plaintiff, entered in the Tioga county clerk's office August 20, 1920.

Judgment unanimously affirmed, with costs, on the opinion of Tuthill, J., at Trial Term. Kiley, J., not sitting. This court disapproves of findings contained in the defendant's requests therefor, numbered three, nine, twenty-one, thirty, thirty-one-a, forty-seven, fifty-seven, fifty-eight and sixty, and finds that in respect to all the transactions of the plaintiff with Biden the latter was the authorized agent of the defendant and acted as such.

The following is the opinion delivered at Trial Term:

TUTHILL, J.: By consent of parties the action has been tried before the court without a jury. The plaintiff bases his cause of action upon the breach of an alleged contract for the purchase by him and the sale by the defendant of bonds and stock of the Connecticut Zinc Company, claimed to have been entered into on or about March 13, 1914, at Waverly, N. Y., where the plaintiff resides. The defendant is a broker with offices in New York city. The alleged purchase and sale were negotiated by one Biden, who the plaintiff asserts was the defendant's agent. The defendant denies such agency and claims the transaction and subsequent events established that Biden, on his own account, was the seller of the bonds and stock and if any one's agent, he became the plaintiff's. Biden's perfidy would naturally deter both parties from sponsoring his manipulations of the deal. If he were selling to the plaintiff his own bonds and stock, or as claimed by the defendant, the bonds and stock which the defendant had verbally optioned to Biden, then the plaintiff's case must fail, for in such event Biden was not defendant's agent, but was selling independently. But if Biden was selling the bonds and stock as defendant's agent, or if defendant adopted Biden's acts or permitted him to continue negotiations with plaintiff with apparent authority from the defendant, then a liability against defendant is established. The case has heretofore been tried and upon appeal by both parties from a judgment in plaintiff's favor, the Appellate Division observed in the concluding sentence of its opinion that the " discussion may serve to clarify the case in respect to some features and the legal propositions involved being thus determined another trial may result in a more consistent and logical verdict and one which at least will not prove unsatisfactory to both parties as well as to the ·court." (*Genung* v. *Turner*, 188 App. Div. 390, 395.) I have, therefore, endeavored to follow the propositions set forth in the opinion. Upon the former and present trials, the question of Biden's agency was an important issue. The original transaction was for the sale of thirty-two bonds of the Connecticut Zinc Company of the par value of $500 each, and 640 shares of stock of the corporation of the par value of $25 per share, making $16,000 par value in bonds and $16,000 par value in

stock. The plaintiff gave his notes therefor payable to and indorsed by himself, aggregating $16,000. These were delivered to Biden who in a memorandum under date of March 15, 1914, acknowledged that the total purchase price was $16,000 " paid in cash or notes," and he agreed to resell the stock for plaintiff under certain conditions. On or about March 21, 1914, the plaintiff saw defendant in his office in New York. The defendant suggested plaintiff's notes should run for longer periods and undertook to have them exchanged for new notes due at later dates, which plaintiff signed and left with defendant, and on March 25, 1914, defendant returned the first set of notes to plaintiff. On this occasion when plaintiff was at defendant's office, defendant gave plaintiff an interim certificate for the bonds and stock of the par value of $16,000 each, and indorsed thereon a receipt for $16,000 in notes. On May 4, 1914, the plaintiff wrote defendant asking for the return of his notes and expressing apprehension as to his ability to pay them. In reply the defendant wrote a letter under date of May 6, 1914, saying " we placed the notes in the hands of a party in Boston, along with a lot of other paper, to get the money to take over the Oronogo Circle," a mining property at or near Oronogo, Mo., which was to be acquired by the Connecticut Zinc Company, and in the letter defendant expressed belief in Biden's ability to take care of the transaction to the satisfaction and profit of both, concluding with the assurance; " If he [Biden] should require help, I stand ready to give it to him. I should be very glad to keep you posted." From the interview with the defendant, the exchange of notes, the issuing of the interim certificate with the receipt for the notes indorsed thereon, and the defendant's letter, the plaintiff might well have believed he was dealing with Turner through Biden as agent. There are many other cogent facts establishing such agency. The appellate court observed (Genung v. Turner, supra, 392): " The question of such agency was extensively litigated and considered at the trial. It was submitted to the jury and they have found in respect thereto in favor of the plaintiff. It is unnecessary to discuss that question further than to say that a review of the evidence convinces us that it was a question of fact and that the evidence fully sustains the verdict of the jury in that respect." I am satisfied I should hold that Biden was the agent of defendant in this transaction. The proposition follows, has the plaintiff established a cause of action, showing his performance of the contract for the purchase of the bonds and stock as originally made or as claimed to have been thereafter modified? The transaction became entangled and confused by the plaintiff's promiscuously renewing his notes at the instance of Biden, who negotiated some of them and failed to account for the proceeds except, as defendant claims, to the extent of $1,636.67. Biden now says the notes he negotiated were for disbursements and expenses in the matter and with the knowledge and consent of the defendant. From the defendant's evidence it appears that in or about the month of December, 1914, he caused to be surrendered to the plaintiff $8,000 of plaintiff's notes which had been given as renewals. These notes were secured by Biden at the behest of the defendant, and Biden took them to Waverly by defend-

ant's direction, who paid the expenses of the trip.  They were surrendered to the plaintiff who gave a receipt which was written by Biden, reading " Waverly, N. Y., Dec. 10th, 1914.  Received from E. C. Biden $8,000 of notes of $500 each given to R. M. Turner for bonds.  Said bonds and stock being taken by E. H. Smith in full settlement on payment of notes. S. A. Genung."  This receipt was delivered by Biden to the defendant. Biden testified that it was agreed that $8,000 of plaintiff's notes should be returned to him which were substituted notes and part of the $16,000. The plaintiff also states in substance that prior to the return of these notes it was arranged with Biden that $8,000 of notes should be returned to him and he would surrender all claim to $8,000 of bonds and $8,000 of stock. So it would seem all parties were of one mind and engaged in a single purpose on December 10, 1914, when the notes of the plaintiff, aggregating $8,000, were returned to him — the diminishing the amount of bonds and stock which plaintiff was to receive by one-half.  In other words, the contract then became one for the sale and purchase of $8,000 of bonds and a like amount of stock.  After December 10, 1914, no notes were given. Upon the trial the plaintiff amended his complaint.  He now alleges performance on his part of an $8,000 contract, asserting on December 10, 1914, he had outstanding notes upon which the defendant was in no way liable, or had paid notes, aggregating more than $8,000.  In fact, plaintiff asserts he had paid or was liable for a larger amount, but the limit of liability under the contract as modified, would be $8,000 in bonds and a like amount par value in stock.  I believe the plaintiff has established that the contract was modified by what occurred between the parties December 10, 1914, and that he has performed his part thereof.  It stands undisputed that Biden discounted at least a portion of the notes and secured the proceeds. To say such was fully understood by plaintiff as a payment for disbursements and expenses or services of Biden, is hardly reasonable or a legitimate deduction from the evidence.  The plaintiff states he never signed a note in this matter except when given to understand it was a renewal note to take up notes which were outstanding.  It is apparent the plaintiff had full confidence in the defendant and believed in Biden as defendant's agent; that he was willing to do and in fact did what was suggested by the defendant or Biden to extricate himself from his unfortunate situation.  It is also a fair inference that plaintiff, in giving his notes from time to time, believed and considered them in renewal of his former notes which he had given for the bonds and stock.  Having reached the conclusion that the contract was modified by the parties and performed by the plaintiff as a contract for the sale and purchase of $8,000 of bonds and stock, it follows that the plaintiff is entitled to damages.  The Appellate Division held that " The measure of damages is the reasonable value with interest of bonds and stock of the zinc company each equivalent in par value to the proceeds of the plaintiff's notes received by the defendant."  (See opinion, p. 393.)  Upon the trial it was conceded that the bonds of the company were paid in full with interest, and the value thereof should be fixed at $8,000.  To determine the reasonable value of the 320 shares of stock which the plaintiff

was entitled to under the modified contract, being one-half the shares he was to receive under the original contract, as the appellate court stated, "presents greater difficulties." The defendant, as the promoter of the mining venture and seller of the stock, indicated a prospective value of at least par, $25 per share. He expressed himself in letters to customers in March, 1914, as to the early payment of dividends and the increasing value of the stock. A quarterly dividend of one per cent was paid on the stock in January and April, 1915. In May, 1915, the defendant stated he had been trading in the stock at $10 a share and had no doubt of getting that amount for it. In January, 1916, he wrote that the last few trades had been at $15 a share and he probably could get that for his client's stock. The defendant testified that in his judgment the representations he made as to the value of the mining property were fairly correct and that it was profitable in 1914 and 1915 as anticipated. Considering all the evidence upon this subject, I conclude the fair market value of the 320 shares of stock in December, 1914, was $3,200. Judgment is directed in favor of the plaintiff in the sum of $11,200, and interest thereon from the date of the commencement of the action, with costs. Findings in accordance herewith may be submitted.